# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ ) | | |
| **CHARLES MOSELEY MARSHALL,** ) | | |
| **JR., d/b/a PSYDA SOLUTIONS,** ) | | |
| ) | | |
| **Plaintiff,** ) | **Civil Action No. 10-cv-2011 (RMC)** | |
| ) | | |
| **v.** ) | | |
| ) | | |
| ) | | |
| **JAMES ALLISON,** *et al.*, ) | | |
| ) | | |
| **Defendants.** ) | | |
| _____) | | |

## OPINION

   Charles Moseley Marshall, Jr., operates a direct-marketing business.  He is a man of imagination and energy.  He complains here that he spent months developing four new communications programs for The Salvation Army but was never paid for his work.  Instead, he claims that The Salvation Army through its officer, Major James Allison, knowingly made and published defamatory statements about Mr. Marshall that caused The Salvation Army to terminate its business relationship with Mr. Marshall.  Unfortunately, Mr. Marshall's imagination has gotten ahead of his facts.  At the close of discovery, Major Allison and The Salvation Army move for summary judgment.  Because Mr. Marshall can show neither that Major Allison made any defamatory statements nor that he tortiously interfered with a business relationship between Mr. Marshall and The Salvation Army, summary judgment will be granted.

# I. FACTS

Mr. Marshall does business as PsyDa Solutions, a small marketing firm based in Greensboro, North Carolina.  A sole proprietor, he has been in business for over eleven years.

The Salvation Army (occasionally, TSA) is a worldwide religious and charitable organization.  It utilizes a quasi-military command structure, and its officers are all trained ministers.  In the United States, TSA is divided into four geographic Territories, each headed by a Commissioner who has both administrative and pastoral duties.  The Southern Territory is headquartered in Atlanta, Georgia and encompasses nine Divisions, including the National Capital and Virginia (NCV) Division, headquartered in Washington, D.C.  This Division serves the District of Columbia, the Commonwealth of Virginia, and two counties in Maryland— Montgomery and Prince George's Counties.  The nine Divisions are each comprised of approximately 350 local commands, also called "Corps"; each of them is fiercely independent. Defendant Major Allison was the General Secretary for the National Capital and Virginia Division at the relevant time.

Mr. Marshall described the challenging business opportunity for PsyDa Solutions at The Salvation Army in what Defendants call the Marshall Narrative.  *See* Reply [Dkt. 20], Ex. I (Marshall Narrative).  The Marshall Narrative, prepared by Mr. Marshall prior to litigation, portrays his view of events.  Mot. for Summ. J. [Dkt. 18] (Mot.) at 5 n.2.  Mr. Marshall does not challenge it here.

Mr. Marshall targeted The Salvation Army because of its complete lack of direct marketing and decided "to embark on the venture knowing full well it would be years to fruition."  Marshall Narrative at 2.  One problem was "the distributive decision making structure," whereby the 350 Corps make their own marketing decisions.  *Id.*  Another problem

was "the fractured command structure of TSA Southern Territory," whereby Mr. Marshall had to first receive the support of officials from the Southern Territory Headquarters and the Divisions before he could present his marketing programs to the local commands.  *Id.*  In fact, Mr. Marshall recognized that the 350 local commands within the Southern Territory are "autonomous" and that they make "their own budgeting and marketing decisions."  *Id.* at 3.  Mr. Marshall noted in his Narrative that "[t]his inverse structure is so imbedded that the Territory [Headquarters] is loath to interfere (or even guide) local command decisions."  *Id.*

The origin of the present dispute is a bit murky.  As Mr. Marshall remembers it, in 2007 Dean Feener approached him about developing a series of donor management and marketing programs for TSA.  Mr. Feener was employed at Southern Territory Headquarters, and Mr. Marshall knew before meeting Mr. Feener that Mr. Feener is the son of the then-Commissioner for the Southern Territory.  Reply, Ex. F (Marshall Dep.) at 51.  Mr. Marshall says that Mr. Feener "gave the impression that he had the authority to enter into contracts with PsyDa and was in charge of the Southern Territory marketing initiatives," that "Feener hired PsyDa," and that "Feener paid PsyDa over $75,000 for product development."  Opp. [Dkt. 19], Ex. 2 (Marshall Decl.) ¶¶ 9-11.

The Salvation Army responds that Mr. Marshall did work for it in the donor research area from 2004 to 2008 pursuant to written contracts, that Mr. Marshall issued invoices for his work, and that TSA paid Mr. Marshall in full.  *See* Marshall Dep. at 33; Def. Statement of Facts [Dkt. 18] ¶ 11.  With regard to Mr. Feener, TSA states that in 2007 TSA hired Mr. Feener to work only on the development of a new donor database called Inter-change.[1]  According to

---

[1] In his sales meetings with personnel at The Salvation Army, Mr. Marshall would sometimes say that he was part of the selection team for a vendor for the new database.  Mr. Feener declares that "Mr. Marshall was not part of that effort."  Feener Decl. ¶ 5.

The Salvation Army, Messrs. Marshall and Feener did not meet until 2008.  Mot., Ex. C (Feener Decl.) ¶¶ 3-4.  The Salvation Army believes that the relevant events unfolded after Mr. Marshall sent Mr. Feener an email in September 2008, offering ideas and concepts that might help The Salvation Army increase its donor participation.  Reply, Ex. G (Feener Dep.) at 27.  Everyone agrees that Mr. Feener "had in [his] budget some preliminary [money for the] effort with PsyDa."  *Id.* at 28-29. The inconsistencies between the parties on these points are not material to the Court's disposition of the motion.  The parties agree that no written contract covered Mr. Marshall's work in developing marketing programs for TSA.

What is clear is that in the fall of 2008, Mr. Marshall was working hard to interest The Salvation Army in his products and was promoting a project called PURL, a Personalized URL.[2]  Mr. Marshall spoke about PURL with Mr. Feener, with Christopher McGown (Divisional Development Director of the Kentucky and Tennessee Division), and with David Sears (Divisional Development Director for the National Capital and Virginia Division). Divisional Directors of Development advise their Divisions in fundraising, marketing and public relations.  Mot., Ex. B (Sears Decl.) ¶ 3.  Messrs. Feener and McGown became fully supportive of Mr. Marshall's marketing efforts and helped him to meet others within The Salvation Army, but both declare that he had no authority to contract with a vendor such as Mr. Marshall.  Feener Decl. ¶¶ 6-7, 11; Mot., Ex. D (McGown Decl.) ¶¶ 5-6, 11.  As noted, Mr. Marshall was well aware of the organizational structure of the Southern Territory and knew that any sale of his

_____

[2] PURL stands for Personalized Uniform Resource Locator.  A PURL is a web address (URL) that is customized for a specific user.  Advertisers use PURLs to attract attention:  a website for http://johndoe.stanleytools.com might cause John Doe to look further and allow the advertiser to track its ad campaign as well as John Doe's subsequent browsing on the site, such as how long he stayed and what links he clicked.

products would have to be made to the local commands within the Territory.  Marshall Narrative at 3 (recognizing that the local commands are "autonomous" entities that make "their own budgeting and marketing decisions" and that Territory Headquarters is loath to interfere).

Mr. Marshall met with Mr. Sears again in the spring of 2009, at which point Mr. Marshall indicated that he wanted to contact some of the Corps within the Nation's Capital and Virginia Division to sell them on his concept.  Mr. Sears advised that the Corps make their own marketing decisions but it would make sense to visit the larger Corps because they would be more likely to be interested and to have the largest pools of donors.  Mr. Sears provided contact information at those Corps.  Mr. Marshall indicated to Mr. Sears that the cost would be "per PURL" (that is, per donor) and not "per activated PURL" (that is, per donor who actively visited his Personalized URL).  As a result Mr. Sears had "serious concerns about the costs versus the benefits of the PURL initiative," which were "shared by several Divisional Directors of Development."  Sears Decl. ¶¶ 7, 8.  At a second meeting in Baltimore between Mr. Marshall and Mr. Sears, Mr. Marshall again confirmed the cost structure for PURL.  In the fall of 2009, Mr. Sears prepared a memo to Major Allison, expressing his concerns about the PURL program.  While Mr. Sears thought the PURL program "conceptually sound," he "questioned its functionality with such issues as keeping a PURL current when, at the time, we were having difficulty keeping our own website current."  Sears Decl. ¶ 5.  Major Allison agreed with Mr. Sears, based on Mr. Sears's review and "his experience in that area."  Reply, Ex. E (Allison Dep.) at 51.

In contrast, Mr. Feener and Mr. McGown became "champions" of Mr. Marshall's PURL program.  Marshall Dep. at 20-21.  By June 2009, after Mr. Marshall had been meeting with people within The Salvation Army for some months, Mr. Feener recognized that "some

persons . . . thought that the PURL idea was a good idea, [but] actually implementing it would have required a series of tests and, assuming successful testing, it would have [had] to be marketed to each of the 350 Corps in the Territory [because] [t]he Southern Territory does not mandate such selections centrally."  Feener Decl. ¶ 9.  Mr. Feener himself was "favorably inclined," and "Chris McGown was trying to assist Mr. Marshall in having his product presented to as many development staff as possible."  *Id.* ¶ 10-11.  Mr. McGown was also favorably disposed toward the Family Store Card Program, another of Mr. Marshall's products.  *Id.* ¶ 9.

In fact, Mr. McGown "assisted Mr. Marshall by facilitating a number of meetings through on-line presentations, personal introductions, and, eventually, 'Webinars' that [Mr. McGown] helped arrange," starting in November 2008.  McGown Decl. ¶ 6.  Having been told by Mr. Marshall that the PURL program needed a minimum of 250,000 donors to make it viable, a donor pool larger than in his Division, Mr. McGown introduced Mr. Marshall to other development personnel in other divisions in the Southern Territory.  *Id.* ¶ 7.  Additionally, "[t]o help support the PURL program," Mr. McGown drafted a letter to his Division Commander asking for development funds for PURL, but the Divisional Finance Board declined to send the letter to Southern Territory Headquarters and no funding was obtained.  *Id.* ¶ 14.  During the spring of 2009, Mr. McGown spoke on the telephone with Major Allison, answering Major Allison's questions about pricing and the structure of the PURL program.  *Id.* ¶ 16.  Mr. McGown informed Major Allison what Mr. McGown "believed the program could accomplish for The Salvation Army."  *Id.*

Mr. Marshall allegedly developed four custom programs for The Salvation Army that were ready to be implemented by July 2009:  PURL; the Family Store Card Program; a Modeling/Analysis program; and a Constituent Loyalty Initiative.  *See* Marshall Dep. at 18-19;

Notice of Removal [Dkt. 1], Ex. A (Compl.) ¶¶ 8-9.  Mr. Marshall claims that he had an enforceable oral agreement covering the PURL program with Mr. Feener and covering the other three programs with both Mr. Feener and Mr. McGown.  Marshall Dep. at 45-47.  Based on his own testimony, he urges the Court to find that the parties had entered into contracts.  Pl. Statement of Facts [Dkt. 19-1] ¶ 8.

Mr. Marshall's business development efforts hit a snag in October 2009.  Just as Mr. Sears was reviewing the Family Store Card Program, at the request of the Charlottesville Corps, and finding it too expensive,

> Mr. Marshall sent an e-mail [to Major Allison] which caused consternation within The Salvation Army.  In that e-mail he referred to the Family Store Card Initiative and made the statement that we "will roll out [that program] Territory-wide."  Due to the decentralized decision-making structure of The Salvation Army, such a statement was construed as a territorial mandate which causes concerns within the command structure of The Salvation Army.

McGown Decl. ¶ 19.  In full, Mr. Marshall's email to Major Allison, dated October 7, 2009, read:

> Major:
>
> I had a most positive meeting with Captain Matthews in Charlottesville.
>
> I presented him with the attached Family Store Card Program proposal.
>
> We are hoping [Charlottesville] will join Greensboro and one other command in this pilot (non ARC) F.S. initiative.  Following a 12 month proof-of-concept, we'll roll out Territory-wide (including ARC).
>
> Best regards,
>
> Charlie

Oct. 2009 Email Exchange at SA00135.  Mr. Marshall admits that he "should have postured" the offending statement within the email differently, as "'[w]e hope to' rather than 'we'll' as if that it was a foregone conclusion."  Marshall Narrative at 16.

Mr. Feener allegedly told Mr. Marshall that Major Allison "took great offence" at the email and it "incit[ed] a response from Maj. Allison of 'like hell you will' or 'over my dead body.'"  Marshall Narrative at 16.  More formally, Major Allison sent an email to Major Mark Brown, Development Secretary for the Southern Territory, explaining that he had permitted Mr. Marshall to visit the Corps in Charlottesville, Virginia, but had since realized that the Family Store Card program "would have to pick up a huge, almost impossible, amount of new quality donors to break even."  Oct. 2009 Email Exchange at SA00133.  He added, "Before I go any further on the matter, I want to know whether this program is endorsed by [Territory Headquarters]?  If the answer is not, "yes," I do not need to expound further and will inform Mr. Marshall accordingly."  *Id.*[3]

In late October 2009, Major Allison and Messrs. Feener and Sears met in Major Allison's office in Washington D.C. to discuss Mr. Marshall's PURL and Family Store Card Programs.  No one else was present.  Mr. Feener and Mr. Marshall discussed the meeting soon thereafter.  Mr. Marshall states that Mr. Feener told him that Major Allison had made the alleged defamatory remarks at the meeting.  Marshall Dep. 39-40. As a result of these events, Mr.

---

[3] This email prompted a prolonged response from multiple officers, to which both Messrs. Feener and McGown jumped in with positive comments on Mr. Marshall's programs.  At the end, Major Allison thanked all participants for their comments and added that his questions were "not intended to bring question to anyone's involvement with Mr. Marshall or his offerings of service to The Salvation Army.  I simply wanted to know whether this program is endorsed by [Territory Headquarters] as implied by Mr. Marshall's statement, 'Following a 12 month proof-of-concept, we'll roll out Territory-wide . . . .'"  Oct. 2009 Email Exchange at SA00127.

Marshall brought this suit alleging that The Salvation Army and Major Allison defamed Mr. Marshall by accusing him of:

> (a)  Misrepresenting support by TSA Southern Territory Headquarters;
>
> (b)  Providing monetary kickbacks to Mr. Feener;
>
> (c)  False inherent problems and "incompetence" relating to the Family Store Card Program; and
>
> (d)  Unauthorized visits to local commands within the Nation's Capital/Virginia Division of TSA.

Compl. ¶ 14.  The Complaint also alleges that Major Allison's alleged defamatory comments interfered with Mr. Marshall's business relationship with TSA and the business relationship ended.[4]  *Id*. ¶¶ 21-24.

## II.  LEGAL STANDARDS

### A.  Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

---

[4] Mr. Marshall brought suit in D.C. Superior Court against both Major Allison and The Salvation Army, seeking $2 million in damages.  Pursuant to 28 U.S.C. §§ 1441 and 1446, Defendants removed the case here based on diversity jurisdiction, as Mr. Marshall is a citizen of North Carolina while Major Allison is a citizen of Virginia and TSA is a Georgia corporation.  *See* 28 U.S.C. § 1332(a) (defining diversity of citizenship).  Venue is proper here, as the alleged defamation and tortious interference occurred in the District of Columbia.  *See id.* § 1391(b)(2) (venue is proper in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred).

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* If the evidence ""is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## B. Choice of Law

Federal courts sitting in diversity must apply the conflicts of law rules of the state in which they sit. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 491 (1941). Thus, to determine what law to apply, this Court must apply the District of Columbia's choice of law rules. *YWCA v. Allstate Ins. Co.*, 275 F.3d 1145, 1150 (D.C. Cir. 2002). To determine which jurisdiction's law applies in a tort case, the District of Columbia courts blend a "governmental interests analysis" with a "most significant relationship" test. *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 842 (D.C. Cir. 2009) (citing *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 40-41 (D.C. 1989) and *Jaffe v. Pallotta Teamworks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004)). Under the governmental interest test, a court evaluates the governmental policies underlying the applicable law and determines which jurisdiction's policy would be most advanced by having its law applied. *Id.* To determine which jurisdiction has the most significant

relationship to a case, courts balance the competing interests of the two jurisdictions and apply the law of the jurisdiction with the more significant interest. *Id.* The court must consider (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered. *Herbert v. District of Columbia*, 808 A.2d 776, 779 (D.C. 2002) (citing Restatement (Second) of Conflict of Laws § 145 (1971)).

Citing only D.C. law in their briefs, the parties seem to agree that District of Columbia law applies. Notably, the alleged tortious conduct occurred here. If one of the parties had sought to apply foreign law, that party would have had the burden of establishing the content of the law of the foreign jurisdiction. In the absence of such proof, a court presumes that the foreign law is the same as the local law and thus that there is no conflict. *In re Parmalat*, 383 F. Supp. 2d 587, 595 (S.D.N.Y. 2005); *Riffe v. Magushi*, 859 F. Supp. 220, 223 (S.D. W. Va. 1994). Accordingly, District of Columbia law applies.

### III. ANALYSIS

To survive summary judgment, Mr. Marshall must demonstrate that there are genuine disputes of material fact that must be decided by a jury. *See Greene*, 164 F.3d at 675. In this case, that requires Mr. Marshall to produce competent evidence that Major Allison defamed him and/or that Major Allison interfered improperly with Mr. Marshall's valid business expectations with the Salvation Army. Mr. Marshall's efforts to demonstrate defamation ultimately fail: his allegations regarding what Mr. Feener told him was said at the October meeting among Major Allison and Messrs. Sears and Feener is inadmissible hearsay and none of the participants supports the defamatory twist Mr. Marshall wants to extract from their

11

conversation.  In addition, Mr. Marshall fails to show that the conversation was not privileged.

Further, Mr. Marshall submits no evidence of a contract, a necessary element of a claim for

tortious interference with contract, and submits no evidence of a commercially reasonable

business expectancy, a prerequisite to a claim for tortious interference with prospective business

advantage.

### A.  Defamation

To recover on a claim for defamation, a plaintiff must prove four separate

elements:

> (1) that the defendant made a false and defamatory statement concerning
> the plaintiff;
>
> (2) that the defendant published the statement without privilege to a third
> party;
>
> (3) that the defendant's fault in publishing the statement amount to at least
> negligence; and
>
> (4) either that the statement was actionable as a matter of law irrespective
> of special harm or that its publication caused the plaintiff special harm.

*Blodgett v. Univ. Club*, 930 A.2d 210, 222 (D.C. 2007) (quoting *Oparaugo v. Watts*, 884 A.2d

63, 76 (D.C. 2005).  Defamation comes from an oral communication that "tends to injure

plaintiff in his trade, profession or community standing, or lower him in the estimation of the

community."  *Smith v. District of Columbia*, 399 A.2d 213, 220 (D.C. 1979).

Mr. Marshall alleges that Major Allison made the following allegedly defamatory

statements at the October 2009 meeting:  (1) Mr. Marshall misrepresented support by Territorial

Headquarters; (2) Mr. Marshall paid kickbacks to Mr. Feener; and (3) Mr. Marshall made

unauthorized visits to local commands.  Compl. ¶ 14.  Mr. Marshall also alleges that Mr.

Marshall referred to him as "incompetent," based on Mr. Marshall's interpretation of emails authored by Major Allison. Marshall Dep. at 38.

In their motion for summary judgment, Defendants assert that the alleged statements either were not made or, if they were, that they were not "defamatory." To avoid Defendants' motion for summary judgment on the defamation claim, Mr. Marshall must present admissible evidence demonstrating a genuine dispute of material fact with regard to at least one of the alleged defamatory statements. He has not done so.

Mr. Marshall was not present at the October 2009 meeting when Major Allison met with Mr. Sears and Mr. Feener to discuss the PURL and Family Store Card Programs. While Mr. Marshall testified at his deposition that Mr. Feener told him after the meeting that Major Allison had made defamatory statements, *see* Marshall Dep. at 39-40, Mr. Marshall's testimony as to what Mr. Feener said is inadmissible hearsay, insufficient to overcome summary judgment. *See* Fed. R. Evid. 801 (defining hearsay); *Wilkerson v. Wackenhut Protective Servs., Inc.*, 813 F. Supp. 2d 61, 67 (D.D.C. 2011) (personal belief, speculation, and hearsay are insufficient to defeat a motion for summary judgment). Mr. Marshall does not respond to the hearsay argument and thus the issue is deemed conceded. *See FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997) (when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded).

Further, with regard to the statement that Mr. Marshall "misrepresented support by Territorial Headquarters," Mr. Marshall admitted that this was true. Mr. Marshall sent an email to Major Allison on October 7, 2009, stating that he had presented the Family Store Card program to Captain Matthews in Charlottesville and that "[f]ollowing a 12 month proof-of-

concept, *we'll roll out Territory-wide . . .*".  Oct. 2009 Email Exchange at SA00135 (emphasis added).  Mr. Marshall knew that each Corps was responsible for making its own budgeting and marketing decisions, *see* Marshall Narrative at 2-3, and he later noted that he "should have postured" the "offending" statement differently, as "'[w]e hope to' rather than 'we'll' as if that it was a foregone conclusion."  *Id*. at 16.  For a statement to be the basis of a defamation claim, it must be false and defamatory.  Mr. Marshall has acknowledged that he in fact did misrepresent his support from the Territory.  Because the statement is true, it cannot give rise to a defamation claim.  *See Blodgett*, 930 A.2d at 222.

        In addition, Mr. Marshall offers no evidence to overcome the sworn testimony of all meeting participants that there was no intimation that he was actually paying or offering kickbacks.  Mr. Feener stated in his Declaration that no one accused Mr. Marshall of engaging in kickbacks:

> Mr. Sears and/or Major Allison told me that Mr. Marshall had been dropping my name in his presentations to various Corps.[5]  Also at the meeting Mr. Sears raised some questions about the financial viability of PURL for any individual location.
>
> . . . [N]o one ever accused anybody of giving or offering kickbacks.  If the word kickback was used it was used in the context of Major Allison and/or Mr. Sears cautioning me about the appearance of receiving something.  I have never told Mr. Marshall that anyone accused him of participating in kickbacks.

Feener Decl. ¶¶ 12-14.  Mr. Feener's deposition testimony was consistent:

> The specific nature of that discussion was ["]your name was dropped so many times that if we didn't know you better, we would have wondered if

---

[5] Mr. Marshall concedes that he used Dean Feener's name when attempting to sell his marketing programs to TSA.  Mr. Marshall described how "[i]n the course of presenting PsyDa marketing initiatives to TSA staffers throughout the Southern Territory, I often mentioned Dean and Interchange and how the internal donor database was the catalyst and platform for fundamental, overarching and exciting new outreach initiatives to come."  Marshall Narrative at 16.

> you were getting kickbacks.["] . . . At no point . . . did anyone accuse anybody of that.
>
> . . . .
>
> So, again, as I stated, there was an indication [in Mr. Marshall's October email] that this was a [Territory Headquarters] mandated position, that my name was dropped so much that it was almost like I was getting a kickback . . . .

Feener Dep. at 85-86.  Mr. Sears described the October 2009 meeting similarly:

> On or about October 20, 2009, Major Allison, Dean Feener and I met in Major Allison's office to discuss Mr. Marshall's initiatives.  We met to discuss PURL, the Family Store Card Program, the pros and cons of each, and whether the Inter-change data base could support the PURL program.
>
> During the meeting Major Allison cautioned Dean Feener that Mr. Marshall was dropping Mr. Feener's name in his visits.  I too was concerned that Mr. Marshall was using Mr. Feener's name, which is the same last name of his father, the then Commissioner of the Southern Territory of The Salvation Army.[6]  I was also concerned that Mr. Marshall may been overstating his relations with Territorial personnel which might give the appearance that the Territory was encouraging or mandating use or purchase of [Mr.] Marshall's product.
>
> I am advised that the Complaint in this case alleges that Major Allison made various accusations against Mr. Marshall at this meeting.  I do not recall any comments by Major Allison that could be construed as an "accusation" against Mr. Marshall.  I do not recall hearing the word kickback used at all.

Sears Decl. ¶¶ 12-14.  Major Allison's recollection of the October 2009 meeting was the same:

> In late October 2009 I met with Dean Feener and David Sears in my office in Washington, D.C. to discuss Mr. Marshall's PURL and Family Store Card initiatives.  . . . During the meeting we discussed our concerns regarding cost and populating the PURL.  We also talked with Dean Feener about concerns that his name was being used considerably in Mr. Marshall's sales campaign and that Mr. Sears believed that Mr. Marshall may have been overstating his backing by Territorial Headquarters.

---

[6] In their later telephone conversation about this meeting, Mr. Marshall suggested that "we need to get the commissioner [of the Southern Territory, Mr. Feener's father] involved and I recall saying that is just not the way the organization works."  Feener Dep. at 89.

> In the context of those concerns I cautioned Dean Feener that he should take care that no third-party should have any reason for concluding that there was an appearance that Dean was getting something in return for his support. I do not recall using the work kick-back but may have used that word or the words "something in return." I did not accuse anyone of any impropriety at all. My concern was for the appearance that Dean Feener might present.

Allison Decl. ¶¶ 12-13. As shown here, Mr. Marshall presents no evidence that Major Allison accused him of paying kickbacks. Moreover, the context of the conversation cannot be stripped from the words: a senior executive (Major Allison) cautioned a younger employee (Mr. Feener) to avoid even the appearance of impropriety. There is no defamation in such circumstances.

Instead of presenting evidence that Major Allison made one of the alleged defamatory statements, Mr. Marshall attempts to paint Major Allison as untruthful by pointing to Mr. Feener's testimony that Major Allison had had an in-person meeting with Mr. Marshall, *see* Feener Dep. at 66-67, when the two never had such a meeting. Mr. Marshall argues that "these false statements by [Major] Allison . . . were designed to defame [Mr.] Marshall by creating the impression that [Mr.] Marshall was misstating his support from Territorial Headquarters/Feener." Opp. at 6. The non sequitur in the argument renders it incomprehensible: Mr. Marshall does not explain how an erroneous statement about a Marshall/Allison meeting could possible convey any impression about the level of support to Mr. Marshall from Territory Headquarters or Mr. Feener. Nothing defamatory can be inferred from a statement that Major Allison did or did not have an in-person meeting with Mr. Marshall.

Mr. Marshall also relies on Mr. Feener's deposition to demonstrate that Major Allison defamed him by "accusing him of making unauthorized visits to the commands." Opp. at 6; Feener Dep. at 67 ("Major Allison indicated that he thought [Mr. Marshall] had made unauthorized visits to some of his local commands."); *id.* at 88. Notably, Mr. Marshall does not

explain how a statement that he was visiting Corps without permission could be deemed defamatory; such a statement would not tend to "injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community."  *Smith*, 399 A.2d at 220.[7]

Mr. Marshall also alleges that Major Allison defamed him by stating that there were "false inherent problems and 'incompetence' with Marshall's Family Store Card Program." Compl. ¶ 14.  Mr. Marshall asserts that "Allison began sabotaging Marshall's initiatives by badmouthing Marshall and expounding erroneously upon the new programs' minor complications."  Opp. at 3-4.  Based on the questions Major Allison raised in emails about the Family Store Card Program, Mr. Marshall inferred that Major Allison had accused him of incompetence.  Marshall Dep. at 38; Opp., Ex. 8 (June 29, 2009 Email); October 2009 Email Exchange.  Major Allison's June 2009 email to local commands in the National Capital and Virginia Division stated:

> Dear Friend:
>
> It is likely you have recently received an email from Charles Marshall regarding PURLs.  If not, then you may determine that your need to read further is of little value.
>
> David Sears and I have discussed the PURL and like the theory behind the concept as well as the concept itself.  *However, we are adamant that there must be an ongoing flow of items to help populate the PURLs.  In order for the PURLs to work effectively you must update the site monthly with a*

---

[7] Major Allison testified in his deposition that Mr. Marshall was free to visit any Corps that he wished to visit, *see* Allison Decl. ¶ 15, and noted in an email that Mr. Marshall was "given permission" to visit various Area Commanders.  Opp., Ex. 9 (Email Exchange) at SA00128 (Major Allison's Oct. 20, 2009 email to Mr. McGown, stating "Mr. Marshall has been given permission to meet with the three Area Commanders in NCV regarding PURL with the understanding that the DFB would entertain recommendations/ proposals from the Area Commander(s) should they choose to move forward.  Likewise, Mr. Marshall was given the same clearance to meet with Captain Dan Matthews in Charlottesville, Virginia regard the [Family Store Card Program].")

> *wide range of ongoing stories, articles, pictures, etc. . . . or the donor will soon grow weary of seeing the same stories and messages. Based on current web-site activity/updates we do not believe that many of our Corps currently produce a sufficient volume of material on a monthly basis to adequately populate a range of PURLs.* History/experience bears out that donors tend to have an interest in various programs and services provided by the Army (youth, homeless, poverty, etc.) but will not return to the site if the information does not capture their interest and is not updated timely.
>
> We understand that [Territory Headquarters] is involved in testing PURLs, but the nature of their involvement in the development of material and ongoing support is unclear. *The Development Department, David Sears, is concerned about donors signing up for a PURL, with the Corps paying the $0.90 a year for each PURL, but rarely visiting the PURL as it is not constantly being updated. While we want to find ways to be on the cutting edge, we need to be careful about being on the bleeding edge.*
>
> *Again, the nature and level of [Territory Headquarters's] support is unclear. We will provide information as it becomes available.*
>
> If you believe that your Command/Corps currently generates enough material to populate and support PURLs, and you are considering this system, please contact David Sears regarding your plans/ recommendations. We want to be helpful in every way and look forward to your feedback. Thank you for all you are doing. You are appreciated!

June 29, 2009 Email (emphasis added). In sum, Major Allison raised concerns regarding the cost of PURL and questioned the nature and level of support for the program from Territory Headquarters.

Later, on October 16, 2009, Major Allison sent an email to Major Mark Brown, Community Relations and Development Secretary, Territory Headquarters, voicing concerns regarding the cost of the Family Store Card Program and questioning the nature and level of Territory Headquarters support for that program:

> Dear Major Brown:
>
> I agreed to permit Mr. Charles Marshall [to] visit with Captain Dan Matthews, Corps Officer in Charlottesville, Virginia to discuss this model. When I reviewed the information and quickly calculated the up-front cost, $15,000 +/-, I soon realized that the Family Store would have to pick up a

> huge, almost impossible, amount of new quality donors to break even.
> Then I viewed the receipt, which indicates that we would place a value on
> the items for the donor, and wondered whether the receipt meets Army
> guidelines?   . . . Before I go any further on the matter, I want to know
> whether this program is endorsed by [Territory Headquarters]?  If the
> answer is not, "Yes," I do not need to expound further and will inform Mr.
> Marshall accordingly.  He states that the Greensboro, NC Family Store is
> using this model but I wonder whether the Carolinas [District
> Headquarters] is aware and has approved them to use the model.

Oct. 2009 Email Exchange at SA 00133.  A few days later, on October 20, 2009, Major Allison

wrote:

> My original questions were simple and not intended to bring question to
> anyone's involvement with Mr. Marshall or his offerings of service to The
> Salvation Army.   I simply wanted to know whether this program is
> endorsed by [Territory Headquarters] . . . and whether the receipting
> component is in compliance with IRS and Army policies?

*Id*. at SA00127.  Mr. McGown, a recipient of the email responded, "This is all fun, right?" to

which Major Allison answered, "Loads and loads of fun.  Almost as much fun as a trip to the

dentist."  *Id*.

Mr. Marshall merely points to these emails and, without further argument or

explanation, claims that they derided him as "incompetent" even though they said no such thing.

Major Allison was skeptical about whether the PURL program was workable because none of

the Corps generated enough material to populate and support PURLs.  He wondered if the

upfront cost of approximately $15,000 for the Family Store Card Program would be recouped via

a sufficiently large number of new donors.  He noted that the proposed receipt to be used in the

Family Donor Card Program placed a value on the items for the donor and asked whether the

receipt meets The Salvation Army guidelines.  He also asked whether the Southern Territory

itself supported the programs.  Major Allison's statement that dealing with these matters was "[a]

lmost as much fun as a trip to the dentist" appears to be meaningless banter and not a comment

about Mr. Marshall.  Contrary to Mr. Marshall's take on these emails, the Court does not see how they can be read objectively as disparaging of Mr. Marshall.  Major Allison's email statements do not constitute actionable defamation.

### B.  Common Interest Privilege

Although Mr. Marshall does not articulate the point, expressing concern that an overly-involved employee may appear to be receiving kickbacks arguably conveys the idea that someone might be paying kickbacks.  However, to the extent that Mr. Marshall intends to make such a claim, the claim would be precluded by the common interest privilege.  The common interest privilege protects otherwise defamatory statements made (1) in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest.  *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006) (citing *Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990)).  This privilege does not apply if the publication was made with malice.[8]  *Moss*, 580 A.2d at 1025. Defendants have the burden of proving the common interest privilege, while Mr. Marshall bears the burden of defeating the privilege by showing publication with malice.  *Mastro*, 447 F.3d at 858.  Malice is "the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will."  *Id*.  "Even a showing of ill will does not 'forfeit the privilege so long as the primary purpose is to further the interest which is entitled to protection.'"  *Mastro*, 447 F.3d at 859 (quoting *Columbia First Bank v. Ferguson*, 665 A.2d 650, 656 (D.C. 1995).

---

[8] The common interest privilege also is precluded if there was "excessive publication," i.e., "publication to those with no common interest in the information communicated, or publication not reasonably calculated to protect or further the interest."  *Moss*, 580 A.2d at 1024.  The question of "excessive publication" is not at issue here.

In *Mastro*, the plaintiff alleged that his former employer defamed him when it published a memo suspending him for "serious/major incidents of lack of candor and a serious/major incident of unsatisfactory performance" and a second memo terminating him for the same reasons. 447 F.3d at 849. On summary judgment, the district court determined that the common interest privilege applied and there was no evidence of malice to defeat the privilege. The D.C. Circuit affirmed:

> The primary purpose behind management's publication of the memoranda was not to sully Mastro's reputation, but to document the events leading to Mastro's dismissal in conformance with company policy and applicable law. Whatever impermissible motives may have prompted Pepco management to terminate Mastro, Mastro has presented no evidence suggesting that the communication to a small group of appropriate individuals was driven by anything more than the mundane need for businesses and governments to keep track of personnel actions.

*Id.* at 859.

Here, the topics of conversation at the October 2009 meeting between Major Alison, Mr. Feener, and Mr. Sears were:  the PURL and Family Store Card initiatives; concern regarding cost and populating PURL; concern regarding the appearance created when Mr. Marshall repeatedly used Mr. Feener's name in his program sales campaign; and concern that Mr. Marshall was overstating his backing by Territory Headquarters. Allison Decl. ¶¶ 12-13. Because the conversation was only among three individuals with common interests on matters within their common interest, Defendants have demonstrated that the common interest privilege applies.

Mr. Marshall contends that Major Allison made the statement regarding kickbacks with malice, relying only on the "tone" of Major Allison's June and October 2009 emails, which are quoted extensively above. *See* Opp. at 10. But the inference of a negative "tone" in these emails is not justified, as can be plainly seen by reviewing the emails. Moreover,

allegation of a mere "tone" does not constitute sufficient evidence to support a claim of malice. A negative "tone" is not enough to show that Major Allison acted with "a conscious indifference or reckless disregard as to . . . results or effects upon the rights or feelings of others." *Moss*, 580 A.2d at 1025.   Such an unsupported allegation of malice cannot defeat the common interest privilege, which bars Mr. Marshall's defamation claim.

### C.  Tortious Interference

Mr. Marshall also claims that Major Allison's allegedly defamatory remarks constituted tortious interference with Mr. Marshall's oral contracts with The Salvation Army and with his business relationship with The Salvation Army.  Compl. ¶¶ 21-24.[9]  The elements of a claim for tortious interference with contract are:  (1) the existence of a valid contract; (2) knowledge of the contract on the part of the interferor; (3) intentional interference causing termination of the contract or causing a failure of performance by one of the parties; and (4) resultant damage.  *Onyeoziri v. Spivok*, 44 A.3d 279, 286 (D.C. 2012); *Libya v. Miski*, Civ. No. 06-2046(RBW), 2012 WL 3860587, *9 (D.D.C. Sept. 6, 2012).  "Motive or purpose to disrupt ongoing business relationships" is required to establish liability, not merely intent to interfere or knowledge that conduct will harm plaintiff's business dealings.  *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 422-23 (D.D.C. 1988) (citing *Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449, 1456 (9th Cir. 1983)).  A plaintiff cannot establish liability without a strong showing of intent to disrupt ongoing business relationships.  *Id.* at 423.

Mr. Marshall alleges that he had oral contracts with The Salvation Army, entered into by Messrs. Feener and McGown and worth more than $1,000,000.  But Messrs. Feener and McGown state unequivocally that they had no authority to enter into such contracts on behalf of

---

[9] The parties agree that there was no written contract.

The Salvation Army, and Mr. Marshall presents no evidence to the contrary.  Further, Mr.

Marshall's assertion that such oral agreements existed is belied by his explicit recognition that

the local commands make their own marketing decisions, and that those decisions are not made

by Territory Headquarters where Mr. Feener was employed or by the Divisions where Mr.

McGown was employed.  *See* Marshall Narrative at 2-3.

    The claim that there were valid oral contracts also is undermined completely by

the dearth of evidence regarding any of the key terms of such alleged contracts.  To be valid, a

contract must include all material terms, including subject matter, price, and duration.  *Rosenthal*

*v. Nat'l Produce Co.*, 573 A.2d 365, 370 (D.C. 1990).  Mr. Marshall has not presented evidence

setting forth key contract terms such as the alleged cost to The Salvation Army, the scope of

work, or the duration of the oral contracts.  Because there were no valid contracts between Mr.

Marshall and The Salvation Army, there were no valid million dollar contracts with which Major

Allison could have interfered, and summary judgment must be granted in favor of Defendants on

the claim for tortious interference with contract.

    The elements of a successful claim for tortious interference with a prospective

business advantage are (1) the existence of a valid business relationship or other expectancy;

(2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional

interference causing termination of the relationship or expectancy or causing a failure of

performance by one of the parties; and (4) resultant damage.  *McNamara v. Picken*, 866 F. Supp.

2d 10, 15 (D.D.C. 2012) (describing D.C. law); *Libya*, 2012 WL 3860587 at *9 (same).  A

plaintiff must allege a business expectancy, not grounded in a present contractual relationship,

which is commercially reasonable to expect.  *McNamara*, 866 F. Supp. 2d at15.  "A valid

business expectancy requires a probability of future contractual or economic relationship and not

a mere possibility." *Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 55 (D.D.C. 2012) (describing D.C. law).

Mr. Marshall fails to submit any evidence supporting his claim that a future contract or economic relationship with The Salvation Army was actually probable.  His avid belief that he could/would sell the four programs that he claims to have developed specifically for The Salvation Army (the PURL program, the Family Store Card program, the Modeling/Analysis program, and the Constituent Loyalty Initiative) is not supported by the facts. After a full year of sales efforts, Mr. Marshall had not made a single sale of these untried marketing programs to a single local command.  At the time Mr. Marshall was deposed, PsyDa had only one customer.  Marshall Dep. at 13.  Because he has not presented anything showing that the alleged expectancy was commercially reasonable, the claim for tortious interference with business expectancy fails.

## IV.  CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment [Dkt. 18] will be granted and judgment will be entered in favor of Defendants.  A memorializing Order accompanies this Opinion.


Date: December 14, 2012                           _____/s/_____
                                                  ROSEMARY M. COLLYER
                                                  United States District Judge